shows that the wound was at least 5 inches in depth, a stab in character.

Under the facts detailed we would hardly feel justified in disturbing the verdict, and the judgment is therefore affirmed.

---

THOMAS v. STATE.   (No. 4803.)

(Court of Criminal Appeals of Texas.   Jan. 23, 1918.)

HOMICIDE ☞234(7) — SUFFICIENCY OF EVIDENCE.

Circumstantial evidence *held* sufficient to sustain the conviction of murder of defendant's father.

Appeal from District Court, Ellis County; F. L. Hawkins, Judge.

Frank Thomas, Jr., was convicted, and appeals. Affirmed.

E. B. Hendricks, Asst. Atty. Gen., for the State.

PRENDERGAST, J. Appellant was convicted of the murder of his father, and his punishment assessed at 99 years in the penitentiary.

The sole question for determination is whether or not the evidence was sufficient to sustain the verdict.

Appellant himself testified and denied substantially every incriminating circumstance which had been testified to by the various witnesses against him. In many instances he said that where the several witnesses had testified to incriminating facts against him that they had lied. Every witness against him was apparently, if not really, a disinterested and unprejudiced witness. However, their credibility was a question for the jury and the lower court to determine. It is clear that by the verdict and judgment they believed the witnesses against him, and did not believe him on the controverted points. The evidence of his guilt was wholly circumstantial. The court so told the jury, and gave a correct charge thereon, and submitted every issue in the case by an apt charge. No complaint was made to the charge of the court in any particular.

It is not deemed necessary to give every item of the testimony tending to show appellant's guilt. Only a brief summary of the material facts established by the evidence will be given.

On the night of December 27, 1917, between about 1 and 2 o'clock appellant's father was brutally murdered while in bed asleep. The instrument used was the deceased's own axe, which was found in his house with blood on it. Deceased, with it, had been chopped in the head, one arm almost severed from his body, and one cut in his breast, the latter wound so deep as to perhaps go to the back, if not through. These wounds caused instant death.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

By his own testimony appellant showed that he had gotten out of the penitentiary on May 23, 1916, and at once went to his father's, who was living on a farm in Ellis county about three miles from the town of Alsdorf. He had no means, and by his own testimony gambling seems to have been his business. He had been living at his father's, or making it his headquarters, and for some time and up to the morning of the day when deceased was murdered that night a certain negro woman had been living at his father's for some weeks. Appellant had been keeping her there. Several witnesses testified that at different times, shortly before the murder, he had tried, sometimes with success, and at other times without, to get money from his father. They also testified that his father along about this time repeatedly insisted to appellant that he should go to work, and that appellant failed or refused to do so. They testified also that his father repeatedly demanded that he and said woman too should go to work or leave his place, and finally at his insistence appellant and said woman did leave, moving on the morning of the night deceased was murdered.

Robert Whitten had lived and worked for deceased from August until deceased was murdered. Among other things, he testified:

"Defendant and his father did not get along so well. The old man was always saying that that boy would get into trouble, just laying around there; he said he wanted him to leave there; he wasn't doing anything only just laying around there, and eating up his grub and feeding that woman off of him. I heard old man Frank Thomas tell defendant that he wanted him to move. The old man would start to talking to the boy, and the boy would get up and start off; would not have any words with the old man. Defendant said, 'I am going down this morning; if papa don't pay me he is going to have hell.'"

He further swore that said woman cooked breakfast on the morning before the murder that night, and that when she came back in the room she sat down and appellant sat in her lap, and said to her:

"I would rather see you move as see papa mistreat you. I am getting damn sore of the way he is mistreating me, telling all the people I am beating him out of his money. I would rather see you move."

They both did move from deceased's that morning. He further swore:

"I heard his father tell him he wanted him to leave there lots of times, and when his father would say anything to him, he would stand up and look at him and would go on off. Defendant worked regularly for a while there, but after that woman moved there he didn't work any, would not pick any cotton; only sometimes he would go in the field and pick a little; would pick about a hundred pounds and go on back to the house. Defendant and this woman would not work, and that is the reason old man Frank Thomas wanted them to leave there, so he could get somebody else in the room so they could pick the cotton. He said defendant and this woman were around there, wasn't doing him no good, and eating up his grub, and wasn't picking any cotton."

He also swore that he heard deceased tell said woman to get out, and further:

"Defendant would be kind to his father at times, until his father would not let him have it, and then he would get mad. When defendant would get mad he would talk about it. He said his father would let everybody else have money; let strangers have it quicker than him. Defendant told me that. Sometimes he told his father that."

He swore a week or so before the murder:

"I heard the old man tell defendant lots of times to move, but I could not say just exactly when he would tell him that. Deceased said, 'I want you all to get away from here; you won't help me pick cotton, just laying around here—help me eat up my grub—I would rather you get out and let somebody else have the house that would help pick cotton;'" that said woman was present on that occasion.

Will Jones testified that:

A short time before the murder appellant came to him, in his field and told him about how his father had been treating him, and that he was feeling a little sore. "He had done got so sore until he didn't feel he could stand it much longer, and the best thing he could do was to get him a little money and light out, because he said there was liable to be some trouble if he didn't do it. * * * If I don't he is going to have hell with me; that is all there is to it."

Sebe Peterson testified that he had stayed and picked cotton at deceased's some month or two shortly before the killing; that when deceased would get after appellant about not working, "defendant would tell his father he didn't want to work." He swore that about a month before the murder "I had a conversation with defendant one morning in which he just told me that he was awful sore at the old man. He told me he was going to kill somebody before the year was out."

Nelson Thomas, a brother of deceased who lived at Groesbeck, was phoned of the death of the deceased, and went to his funeral; that while there he met appellant and had a talk with him, and he swore that appellant admitted to him he had made remarks that he had to leave there or he was going to kill his father, but he did not mean it. Said witness Whitten further swore that while said woman lived at deceased's appellant slept in the bed with her.

It was shown by several witnesses, neighbors of deceased, that some two or three of them were at deceased's with him and said witness Whitten, who lived there, the night before deceased was killed; that they remained with him until about midnight, when they all left and went to their homes, leaving only deceased and Whitten there. Some two or three witnesses swore that they went from a certain locality on one side from where appellant lived, in an automobile, from a party that night, just before 12 o'clock; that some short distance before they reached appellant's house they passed appellant going in the direction of his father's; that this was about one-fourth mile from his father's; they all identified appellant, and swore that they passed him at this point; that they went on beyond deceased's some few hun-

dred yards, where one of the party who was in the automobile lived, and he got out.

Whitten further swore that he and deceased went to bed shortly after these neighbors left, deceased sleeping on the bed and he on the floor on a pallet; that they talked awhile after they had lain down, but they both went to sleep; that between 1 and 2 o'clock he was awakened by a noise in the room. He swore: "When I woke up I heard something go just like a hog, like when you strike a hog, so I woke up and started to raise up on my pallet. I laid there, and then I heard a lick strike. I started to get up, and I heard a 'tong' go again, and I just laid there. I was afraid to get up. I heard them at the door, and then I heard them strike another lick, and looked to me like somebody stood there a little bit after they struck the last lick, and I heard them tiptoe to the door. I could hear them when they went out and jumped off of the front porch and run into some bedsprings." That he then got up, struck a light, and found that deceased had been killed, and the axe with which he had been killed. That he then called to different persons over the phone, trying to get them to come there, and aroused several persons, among them an officer some miles distant, who later came to the deceased's. Not much hunting for tracks was had until after daylight the next morning, but persons were kept away from the locality so as to avoid other tracks being made.

Whitten further swore:

"Whoever killed deceased jumped off of the porch and ran into some bedsprings. I did not take a shoe and measure those tracks to see if they would fit certain tracks, but Mr. Hargus did, and I saw him do that. He took little Frank's shoe. That shoe fit that track. They traced that track down across the field, cotton patch. Mr. Hargus taken a stick and measured the track, and then came back and measured by the shoe."

Another witness, Will Jones, testified that he with another examined some tracks that were made around the house on the east side next to the kitchen, where a number of old bed springs were; that they traced these tracks across the field. They led across the field towards town, and they were fresh tracks. It was shown that it was three miles from deceased's house to the town of Alsdorf and seven miles from Alsdorf to the town of Rosser, and six or seven miles straight across the country from deceased's house to Rosser. Several witnesses swore that between 3 and 4 o'clock, perhaps about 4, appellant appeared afoot at a negro boarding house, knocked, and was admitted, went to bed, and remained there until after breakfast the next morning. The distance from deceased's to said boarding house would show that appellant could have reached it when he did after committing the murder.

The evidence, and none of it, points to any person other than appellant as the person who committed the murder. It all taken together reasonably excluded the idea that any other than appellant killed his father. The jury saw all the witnesses and appellant when they testified. They saw their manner of testifying, and were the exclusive judges of

their credibility. A fair, experienced, and learned trial judge also heard all the evidence, and saw the witnesses when testifying. They found appellant to be the guilty party. The evidence was sufficient to justify their finding.

The judgment will therefore be affirmed.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes